This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Carl Taylor has appealed a decision of the Lorain County Court of Common Pleas that found him guilty of murder, tampering with evidence, and a firearm specification. This Court affirms.
 I {¶ 2} On July 24, 2001, Appellant was indicted by the Lorain County Grand Jury on one count of murder, in violation of R.C. 2903.02(A), with a firearm specification attached; and one count of tampering with evidence, in violation of R.C. 2921.12(A). Appellant pleaded not guilty and the case proceeded to trial on September 25, 2001. After the state rested its case, Appellant moved for acquittal pursuant to Crim.R. 29. The trial court denied the motion and Appellant presented his defense. At the close of all the evidence, Appellant renewed his Crim.R. 29 motion and the trial court again denied the motion. The case was submitted to the jury and the jury returned a verdict of guilty on all counts as charged in the indictment. Appellant was sentenced to terms of imprisonment of fifteen years to life for murder, plus three years for the firearm specification, to be served consecutively. He was sentenced to one year for tampering with evidence, to be served concurrently with his sentence for murder. Appellant has appealed his convictions, asserting six assignments of error.
 II Assignment of Error Number One {¶ 3} "THE TRIAL COURT ERRED TO THE PREJUDICE OF [APPELLANT] WHEN IT ALLOWED THE STATE TO IMPEACH ITS OWN WITNESS IN VIOLATION OF THE RULES OF EVIDENCE."
 {¶ 4} In Appellant's first assignment of error, he has contended that the trial court erred when it allowed the state to impeach its own witness with a prior inconsistent statement without a showing of surprise and affirmative damage pursuant to Evid.R. 607. Appellant has further contended that by allowing the state to impeach its own witness, the trial court effectively allowed the prosecutor to testify before the jury, thereby resulting in prosecutorial misconduct. We disagree.
 {¶ 5} Evid.R. 607(A) provides in pertinent part:
 {¶ 6} "The credibility of a witness may be attacked by any party except that the credibility of a witness may be attacked by the party calling the witness by means of a prior inconsistent statement only upon a showing of surprise and affirmative damage."
 {¶ 7} Pursuant to Evid.R. 607, a party is permitted to impeach his own witness if he can demonstrate surprise and affirmative damage. "Surprise can be shown if the testimony is materially inconsistent with the prior written or oral statements and counsel did not have reason to believe that the witness would recant when called to testify." State v.Holmes (1987), 30 Ohio St.3d 20, 23. Affirmative damage can be shown where a witness' testimony is inconsistent with his prior statements and such testimony also contradicts, denies, or harms the calling party's position. State v. Baker (Nov. 25, 1998), 9th Dist. No. 19009, at 13; see, also State v. Smith, 4th Dist. No. 01CA13, 2002-Ohio-3402, ¶ 56. The existence of surprise and affirmative damage, however, is a decision within the sound discretion of the trial court. See State v.Diehl (1981), 67 Ohio St.2d 389, 391; Baker, at 13. Therefore, this Court will not overturn a trial court's decision to allow a party to impeach his own witness absent an abuse of discretion. An abuse of discretion connotes more than a mere error in judgment; it signifies an attitude on part of the trial court that is unreasonable, arbitrary, or unconscionable. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 8} In the instant case, the state proceeded to impeach its own witness, Leroy Thomas, with prior inconsistent statements Thomas had previously made to the assistant prosecuting attorney. During direct examination of Thomas, the prosecutor asked Thomas to tell the jury what Appellant told him regarding the shooting death of Joseph Suggs. Thomas replied:
 {¶ 9} "Suggs was trying to take the money and the dope from [Appellant's girlfriend], and had his hands on [Appellant's girlfriend]. * * * And [Suggs] had, I guess, reached up to [Appellant] — or, [Appellant] had reached up to [Suggs], as [Appellant] told me, around the neck, and when [Appellant] come [sic] up he had his gun by his side, * * * and when he did, the gun went off. When [Appellant] got to [Suggs], the gun went off."
 {¶ 10} The state later asked Thomas if Appellant had ever stated that he shot Suggs in self-defense. Thomas responded: "Yes, that [Appellant] was scared for his girlfriend[.] * * * So he went ahead and — I could almost picture what happened, that he went ahead and grabbed [Suggs] around the neck, and when he came up, the gun went off."
 {¶ 11} On redirect examination, the state continued to question Thomas about Appellant's claim that he killed Suggs in self-defense. The following exchange took place:
 {¶ 12} "Q. I spoke to you at the [community-based correctional facility], didn't I?
 {¶ 13} "A. Yes, sir.
 {¶ 14} "Q. And you never told me that [Appellant] said anything to you about self-defense, did you?
 {¶ 15} "A. Well, yeah, I didn't recollect then, but now I recollect that he — that Suggs had his hands on [Appellant's girlfriend], and then [Appellant] went for Suggs.
 {¶ 16} "* * *
 {¶ 17} "Q. And when I initially spoke to you, you never told me anything about any self-defense — * * * or talking about [Appellant's girlfriend]? * * * Well, I specifically asked you that question, didn't I, when I spoke with you?
 {¶ 18} "A. Yes.
 {¶ 19} "Q. And you told me, `No,' isn't that a fact? You basically told me that it was over the drugs and the money, that [Suggs] had grabbed the bag [of drugs], and [Appellant] had shot [Suggs]?"
 {¶ 20} During this exchange, the defense made objections to the state's line of questioning. The state then requested that the court declare Thomas a hostile witness pursuant to Evid. R. 607(A). In response to this request, the trial court held a meeting in chambers. While in chambers, the court questioned Thomas regarding a prior interview that took place between himself and the assistant prosecutor.
 {¶ 21} "THE COURT: [D]id you say anything about self-defense to [the assistant prosecutor]?
 {¶ 22} "THE WITNESS: I may not have at that time.
 {¶ 23} "THE COURT: Did he ask you about it?
 {¶ 24} "THE WITNESS: Yes.
 {¶ 25} "THE COURT: And you said nothing?
 {¶ 26} "THE WITNESS: (Shaking head negatively.)
 {¶ 27} "THE COURT: And why are you now saying it?
 {¶ 28} "THE WITNESS: I remember it. I recollect what happened.
 {¶ 29} "THE COURT: You didn't recollect it then?
 {¶ 30} "THE WITNESS: No.
 {¶ 31} "* * *
 {¶ 32} "THE COURT: Okay. Well, I don't know, at this stage. You said [the assistant prosecutor] asked you, you said `No,' or words to this effect, or didn't say anything about self-defense, and now you're telling us. When did you first think about it? When did you first remember it?
 {¶ 33} "THE WITNESS: Actually, now.
 {¶ 34} "THE COURT: Just now?
 {¶ 35} "THE WITNESS: I recollect — or, I remember [Appellant], what he said.
 {¶ 36} "THE COURT: Just now? You didn't remember it just — at the time that you made the statement to [defense counsel]?
 {¶ 37} "THE WITNESS: Exactly, because I was put on the spot. Yes.
 {¶ 38} "THE COURT: But it is not the same statement that you told the prosecutor, is that correct?
 {¶ 39} "THE WITNESS: Yes.
 {¶ 40} "THE COURT: Okay. For these purposes — for purposes of this cross-examination, I will declare [Mr. Thomas] hostile."
 {¶ 41} After reviewing the record, this Court finds that the trial court did not abuse its discretion in allowing the state to impeach its own witness. It is clear from the exchange that took place in the judge's chambers that the state did not know that Thomas would testify that Appellant told him he shot Suggs in self-defense. And despite Thomas' phone call to the assistant prosecutor weeks earlier, in which he told the prosecutor that he was in fear for the lives of his children if he testified, the state believed that Thomas would adhere to the story that he had previously given the state; that is, the state believed that Thomas would testify that Appellant simply shot Suggs over drugs.
 {¶ 42} Furthermore, Thomas' testimony that Appellant told him that he shot Suggs in self-defense lent credence to Appellant's claim that he shot Suggs to protect himself and his girlfriend. Thus, Thomas' testimony struck a blow (or caused affirmative damage) to the state's claim that Appellant killed Suggs in order to prevent Suggs from stealing Appellant's money and drugs.
 {¶ 43} Additionally, we reject Appellant's contention that by allowing the prosecutor to impeach the witness the trial court essentially allowed the prosecutor to testify before the jury, resulting in prosecutorial misconduct. Prosecutorial misconduct cannot me be made the ground for error unless the conduct complained of deprived defendant of a fair trial. See State v. Apanovitch (1987), 33 Ohio St.3d 19, 24. Alleged prosecutorial misconduct must be evaluated within the context of the entire trial. See State v. Keenan (1993), 66 Ohio St.3d 402, 410. However, based on the court's decision to declare Thomas a hostile witness, the state's line of questioning did not amount to prosecutorial misconduct.
 {¶ 44} The state properly asked leading questions pursuant to Evid.R. 611(C), which states:
 {¶ 45} "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions." (Emphasis added.)
 {¶ 46} Whether to declare a witness hostile is within the trial court's discretion. See Ramage v. Central Ohio Emergency Serv., Inc. (1992), 64 Ohio St.3d 97, 111. This Court cannot conclude that the trial court abused its discretion when it declared Thomas a hostile witness because Thomas admitted that, prior to trial, he never told the prosecutor that Appellant shot Suggs in self-defense. As such, the questions the state posed to the hostile witness were in the proper form of leading questions. Because we find that the state's line of questioning was proper pursuant to Evid.R. 611, we conclude that the state's redirect examination of Mr. Thomas did not deprive Appellant of a fair trial.
 {¶ 47} On another matter, we also reject Appellant's argument that the "the court never properly instructed the jury that the impeachment testimony of the prosecutor could not be used as substantive evidence[.]" Appellant did not request such jury instructions, nor did he object to the jury instructions given by the trial court. Thus, he has waived that issue on appeal. See State v. Underwood (1983), 3 Ohio St.3d 12, syllabus.
 {¶ 48} Accordingly, Appellant's first assignment of error is without merit.
 Assignment of Error Number Two {¶ 49} "THE TRIAL COURT ERRED TO THE PREJUDICE OF [APPELLANT] WHEN IT ALLOWED TESTIMONY OF OTHER ACTS WITH WHICH [APPELLANT] WAS NOT CHARGED, THUS DENYING HIM DUE PROCESS OF LAW."
 {¶ 50} In Appellant's second assignment of error, he has argued that the trial court erred by allowing the state to introduce evidence of other unlawful acts committed by Appellant. Specifically, Appellant has contended that the following testimony regarding Appellant's drug dealing was prejudicial to his case: (1) Cynthia Lester's testimony that Appellant had in his possession a bag of crack cocaine and money; (2) Melanie Hyson's testimony that she purchased drugs from Appellant the day before the shooting; and (3) Leroy Thomas' testimony that he also purchased drugs from Appellant in the past and sold a car to Appellant in exchange for drugs. We disagree.
 {¶ 51} The record makes clear that Appellant did not object to any of the testimony which he now argues should have been excluded by the trial court. This Court has repeatedly held that the failure to object to the admission or exclusion of evidence waives any claim of error on appeal. See, e.g., State v. Pasters (May 15, 1991), 9th Dist. No. 90CA004898, at 3; State v. Shorvanek (June 27, 1990), 9th Dist. No. 2545, at 8; Akron v. Simpson (July 6, 1988), 9th Dist. No. 13383, at 2-3. Accordingly, we find Appellant's second assignment of error without merit.
 Assignment of Error Number Three {¶ 52} "[APPELLANT'S] CONSTITUTIONAL RIGHTS TO DUE PROCESS OF LAW WERE VIOLATED WHEN THE COURT STATED THAT [APPELLANT] ACTED PURPOSELY WHEN HE SHOT JOSEPH SUGGS."
 {¶ 53} In Appellant's third assignment of error, he has contended that the trial court erred when it stated to the jury that Appellant admitted purposely shooting Suggs. We disagree.
 {¶ 54} During the state's cross-examination of Appellant, the following exchange took place:
 {¶ 55} "Q. So if I can take this in sum * * * you shot Joseph Suggs, right?
 {¶ 56} "A. Yes.
 {¶ 57} "Q. Okay. And you did it purposely, didn't you?
 {¶ 58} "THE COURT: Asked and answered.
 {¶ 59} "[THE STATE]: I don't think he made that clear, Judge.
 {¶ 60} "THE COURT: Yes, he said he did.
 {¶ 61} "[THE STATE]: Okay."
 {¶ 62} Defense counsel did not object to the court's statement that Appellant had previously admitted that he acted purposely when he shot Suggs. As previously stated, this Court has consistently held that failure to object to the admission of evidence waives any claim of error absent plain error. See Pasters, supra at 3. Appellant has argued, however, that such a statement by the court is plain error as "[t]he outcome of the trial would have been different if the court had not relieved the state of the burden of proving one of the essential elements of the crime of murder, to-wit, purposely causing the death of another."
 {¶ 63} Plain error is defined as "error but for the occurrence of which it can be said that the outcome of the trial would have clearly been otherwise." State v. Sanders (May 17, 2000), 9th Dist. No. 19783, at 3. The Ohio Supreme Court has recognized that the plain error doctrine should be applied sparingly, and only when necessary to prevent a clear miscarriage of justice. Id., citing State v. Wolery (1976),46 Ohio St.2d 316, 327, certiorari denied (1976), 429 U.S. 932,97 S.Ct. 339, 50 L.Ed.2d 301.
 {¶ 64} In the instant case, Appellant claimed that he shot Suggs in self-defense; he did not claim that the shooting was an accident. This Court has previously discussed the difference between a defendant's claim that an unlawful act was the result of an accident versus a claim that the unlawful act was a result of self-defense. Accident involves "the denial of a culpable mental state and is tantamount to the defendant not committing an unlawful act[.]" State v. Howe (July 25, 2001), 9th Dist. No. 00CA007732, at 8, appeal not allowed (2001), 93 Ohio St.3d 1484, quoting State v. Barnd (1993), 85 Ohio App.3d 254, 260; see, also Statev. Kroesen (Nov. 16, 2000), 10th Dist. No. 00AP-48, 2000 Ohio App. LEXIS 5305, at *16. One claiming self-defense "concedes [that] he had the purpose to commit the act, but asserts that he was justified in his actions." (Alterations sic.) Howe, supra at 6, quoting Barnd,85 Ohio App.3d at 260. Appellant claimed that he shot Suggs in self-defense; the trial court also gave jury instructions on self-defense. Because Appellant's affirmative defense to the crime of murder was that he acted in self-defense, he necessarily conceded that he acted purposely when he shot Suggs. As such, we cannot conclude that the trial court committed plain error by stating that Appellant testified that he acted purposely when he shot and killed Suggs. Accordingly, Appellant's third assignment of error is not well taken.
 Assignment of Error Number Four {¶ 65} "[APPELLANT'S] CONSITUTIONAL RIGHTS TO DUE PROCESS OF LAW WERE PREJUDICED WHEN THE COURT WOULD NOT ALLOW [APPELLANT] TO TESTIFY REGARDING HIS STATE OF MIND AT THE TIME OF THE INCIDENT."
 {¶ 66} In Appellant's fourth assignment of error, he has argued that he was denied his right to due process of law when the trial court refused to allow him to testify as to why he possessed a gun in his home and how he had been victimized in the past. We disagree.
 {¶ 67} A trial court has broad discretion in the admission or exclusion of evidence, and this Court will not disturb a trial court's ruling on the admission of evidence absent an abuse of discretion. Statev. Hymore (1967), 9 Ohio St.2d 122, 128, certiorari denied (1968),390 U.S. 1024, 88 S.Ct. 1409, 20 L.Ed.2d 281. An abuse of discretion connotes more than a mere error in judgment; it signifies an attitude on part of the trial court that is unreasonable, arbitrary, or unconscionable. Blakemore, 5 Ohio St.3d at 219. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Berk v. Matthews (1990),53 Ohio St.3d 161, 169.
 {¶ 68} Appellant has argued that the trial court should have allowed him to explain to the jury that he kept a gun on his person because he had been robbed in the past. However, such testimony was irrelevant to Appellant's claim of self-defense. A claim of self-defense where deadly force is employed requires proof that the accused (1) was not at fault in creating the situation giving rise to the affray; (2) had a bona fide belief that he was in imminent danger of great bodily harm, and that his only means of escape was by the use of force; and (3) did not violate a duty to retreat or avoid the danger. See State v. Melchior
(1978), 56 Ohio St.2d 15, 20-21.
 {¶ 69} In proving the second element of a claim of self-defense, a party may, in certain circumstances, provide evidence of the victim's character to show that the party knew the victim was known for being violent and that the party acted on that knowledge in a defensive manner. See State v. Young (Aug. 31, 1994), 9th Dist. No. 93CA005710, at 3 ("A defendant may offer testimony concerning prior violent acts of the victim of which he is aware when arguing self-defense. The purpose of allowing such testimony is to establish the defendant's state of mind in regard to this belief that the victim would kill or severely injure him. However, as the victim's character is not an essential element of self-defense, testimony regarding specific instances of the victim's conduct of which the defendant is unaware is properly excluded pursuant to Evid.R. 405(B)." (Citations omitted.)) However, a defendant may not provide evidence of prior acts of violence inflicted on the defendant by persons other than the victim because such evidence is irrelevant. SeeState v. Taylor (May 5, 1981), 2nd Dist. No. 1467, 1981 Ohio App. LEXIS 12078, at *3-4; State v. Williams (Mar. 16, 1993), 4th Dist. No. 92 CA 07, 1993 Ohio App. LEXIS 1595, at *9-10.
 {¶ 70} Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Evidence that is not relevant is properly excluded pursuant to Evid.R. 402.[1] Testimony regarding prior robberies or violent acts perpetrated by someone other than Suggs is irrelevant, and thus properly excluded pursuant to Evid.R. 402. Such evidence does not prove Appellant's then-existing state of mind as it related to his immediate fear of Suggs. Appellant's testimony could not show that Appellant was in fear of imminent harm from Suggs; at best, it shows a general fear of being robbed. Thus, the trial court properly prevented Appellant from presenting such testimony.[2] Consequently, we find that Appellant's fourth assignment of error lacks merit.
 Assignment of Error Number Five {¶ 71} "[APPELLANT'S] CONSTITUTIONAL RIGHTS TO DUE PROCESS WERE PREJUDICED BY THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL."
 {¶ 72} In Appellant's fifth assignment of error, he has contended that the he was denied effective assistance of counsel when defense counsel failed to properly object: (1) when the state impeached its own witness with a prior inconsistent statement; (2) to prior bad acts testimony; (3) to testimony by the assistant prosecutor, that came in the form of leading questions; and (4) the trial court's characterization that Appellant admitted that he "purposely" shot Suggs.
 {¶ 73} In assignments of error one and three, we held that the state properly impeached its own witness, Leroy Thomas, and asked Thomas leading questions pursuant to Evid.R. 607 and Evid.R. 611(C), respectively. We also concluded that the trial court's characterization of Appellant's action as "purposely" was appropriate in light of the fact that a claim of self-defense necessarily required a defendant to concede that he acted purposely in defending himself. Because the trial court did nothing improper with regard to those issues, defense counsel's failure to object could not result in prejudice to Appellant. As such, we need only address whether defense counsel's failure to object to the testimony of prior bad acts denied Appellant his Sixth Amendment right to effective assistance of counsel.
 {¶ 74} Appellant bears the burden of proof in a claim of ineffective assistance of counsel. State v. Colon, 9th Dist. No, 20949, 2002-Ohio-3985, at ¶ 49. In order to establish the existence of such a claim, Appellant must satisfy a two-pronged test. First, Appellant must demonstrate that trial counsel's performance was deficient by showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed Appellant by the Sixth Amendment. Strickland v.Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.
 {¶ 75} Second, Appellant must also demonstrate that he was prejudiced by his trial counsel's deficient performance. Id. This requires a showing that counsel's errors were so serious as to deprive Appellant of a fair trial, a trial whose result is reliable. Id. Additionally, "[a]n appellate court may analyze the second prong of the Strickland test alone if such analysis will dispose of a claim of ineffective assistance of counsel on the ground that the defendant did not suffer sufficient prejudice." State v. Lansberry, 9th Dist. No. 21006, 2002-Ohio-4401, at ¶ 16, citing State v. Loza (1994), 71 Ohio St.3d 61, 83.
 {¶ 76} After reviewing the record, we cannot conclude that defense counsel was ineffective for failing to object to testimony regarding the prior bad acts. Defense counsel's decision not to object to testimony presented by Cynthia Lester, Melanie Hyson and Leroy Thomas may have been simply a part of defense counsel's trial strategy. In fact, the record shows that on cross-examination of these witnesses, defense counsel asked them to explain their relationship with Appellant; such testimony involved drug transactions the witnesses made with Appellant. This Court will not second-guess strategic decisions of defense counsel. See Statev. Carter (1995), 72 Ohio St.3d 545, 558. Furthermore, Ohio courts have consistently held that trial counsel's failure to make objections is within the realm of trial tactics and does not establish ineffective assistance of counsel. State v. Cureton, 9th Dist. No. 01CA3219-M, 2002-Ohio-5547, at ¶ 55. Therefore, we find Appellant's fifth assignment of error is not well taken.
 Assignment of Error Number Six {¶ 77} "THE TRIAL COURT ERRED TO THE PREJUDICE OF [APPELLANT] WHEN IT OVERRULED HIS MOTION FOR ACQUITTAL MADE PURSUANT TO CRIM.R. 29 OF THE OHIO RULES OF CRIMINAL PROCEDURE."
 {¶ 78} In Appellant's sixth assignment of error, he has challenged the adequacy of the evidence presented at trial. He has argued that the trial court erred by denying his Crim.R. 29 motion for acquittal because there was insufficient evidence to submit the case to the jury. We disagree.
 {¶ 79} Crim.R. 29(A) states in pertinent part:
 {¶ 80} "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."
 {¶ 81} Sufficiency is a legal standard which is applied to determine whether the evidence admitted at trial is legally sufficient to support a conviction for the offense. See State v. Thompkins,78 Ohio St.3d 380, 386. When analyzing issues of sufficiency of the evidence, a reviewing court must view the evidence "`in the light most favorable to the prosecution,' and ask whether `any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Carter (2001), 72 Ohio St.3d 545, 553, quoting Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct. 2781,61 L.Ed.2d 560.
 {¶ 82} In the instant case, Appellant was convicted of murder, in violation of R.C. 2903.02(A), which provides: "No person shall purposely cause the death of another[.]" He was also convicted of tampering with evidence, a violation of R.C. 2921.12(A), which states:
 {¶ 83} "No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 {¶ 84} "(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;
 {¶ 85} "(2) Make, present, or use any record, document, or thing, knowing it to be false and with purpose to mislead a public official who is or may be engaged in such proceeding or investigation, or with purpose to corrupt the outcome of any such proceeding or investigation."
 {¶ 86} Appellant has argued that the state failed to prove all the essential elements of the crime of murder. That is, he has claimed that the state failed to prove beyond a reasonable doubt that he purposely caused the death of another. "The State," so Appellant has argued, "was unable to offer any evidence that [Appellant] purposely shot Joseph Suggs in the head in order to cause Suggs' death." He has further argued that the state failed to prove all the necessary elements of the crime of tampering with evidence. He has contended that "[t]he State failed to prove that [Appellant] washed the blood off of himself in an effort [to] `alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence[.]' [Appellant] was not thinking that he would hinder the State's investigation when he washed the blood from his body. [Appellant] was worried about one thing and one thing only? his own safety."
 {¶ 87} After reviewing the evidence presented at trial, this Court finds that there was sufficient evidence to convict Appellant of murder, with the attached firearm specification, and tampering with evidence.
 {¶ 88} At trial, Leroy Thomas testified that after Appellant shot Suggs, Appellant arrived at the apartment Thomas shared with Melanie Hyson. While there, Thomas stated that Appellant told him that he shot Suggs in self-defense. He explained that Suggs was attempting to harm Appellant's girlfriend and rob him as well. The state, however, impeached Thomas' testimony. The state urged Thomas to admit that he never initially told the state or the police that Appellant killed Suggs in self-defense. Thomas eventually admitted that he only recently remembered that Appellant told him that he shot Suggs in self-defense.
 {¶ 89} Detective John Koglman testified that Sherry Carter, Appellant's girlfriend and roommate, turned herself in after Suggs was shot. He stated that she told the police that she shot Suggs because he tried to rape her. After interviewing Carter, and conducting further investigation, Koglman learned that Carter was not the shooter. He then attempted to locate Appellant. The first time the police contacted Appellant regarding the shooting death of Suggs, Koglman stated that Appellant told the police that he was not at home when Suggs was shot and that the gun that shot Suggs belonged to Carter. However, when the police brought Appellant down to the police station on July 13, 2001, Appellant told Koglman that "at one point, [Appellant] said that [Carter] had let [Suggs] into the — into the house, and that he was — that [Suggs] was trying to get [Appellant's] blue bag, and [Suggs] was in [Appellant's] face, and [Appellant] pulled the gun out and shot [Suggs]."
 {¶ 90} The detective further testified that Appellant told him that he initially lied about the incident because he thought that the police would not believe an ex-con. Koglman stated that Appellant did not tell the police that he shot Suggs in self-defense and that Appellant also admitted to the police that there was "dope and money" in the blue bag Suggs had attempted to steal. Further, Koglman believed, based on his calculations, that Appellant and Carter waited approximately twenty minutes after Suggs was shot before they called the police.
 {¶ 91} Koglman stated that Appellant told him that after he shot Suggs, he went into the bathroom of his apartment and washed the blood from his body. Mark Powell, a forensic scientist, also testified that he found blood in the bathtub that matched Suggs' blood type. Amy Riley, another forensic scientist, testified that there was no gunshot premier residue found on Suggs or Carter. Based on that evidence, Riley stated that she could not say that the weapon used in the shooting of Suggs was fired by either Suggs or Carter.
 {¶ 92} Melanie Hyson, Thomas' girlfriend, stated that she had previously purchased crack cocaine from Appellant and that she sold her car to Appellant in exchange for crack cocaine. Hyson testified that when Appellant showed up at her home after he shot Suggs, he was "very upset, very scared, very shaken." She also testified that while Appellant was at her home he told her that Suggs tried to steal Appellant's drugs, so he shot Suggs. When asked if Appellant ever said he was in fear for his life, Hyson replied: "Not to my knowledge." And when Appellant told Hyson that he shot Suggs because Suggs was reaching for his bag, Hyson testified that she told Appellant:
 {¶ 93} "I just said that that wasn't a very — what I said was, `Why would you do that over dope? I mean, it was just — you wrote your life off, and somebody else's life, over dope.' It was just — to me, it was a very stupid decision, and I told [Appellant] that."
 {¶ 94} Cynthia Lester, a drug addict at the time of the incident in question, testified that she purchased crack cocaine from Appellant the night before the shooting. Hyson testified that it appeared as if Suggs was "GYNC'ing." Hyson explained that when a person is "GYNC'ing" the person has an intense craving for drugs and acts "nerve-racking." However, prior to the shooting, Lester stated that it appeared as if Appellant and Suggs were friends and that they seemed like "buddies." Bobbie Zmich, a drug user who saw the victim and Appellant together the day before the victim was killed, also testified that Suggs and Appellant got along fine.
 {¶ 95} Jonathon Gardner, a forensic scientist, testified that in order to fire, Appellant's gun had to be cocked and the safety disengaged. He stated that the safety was operating properly and that the trigger-pull of the gun was at seven and one-half to eight pounds. Gardner explained that it takes seven and one-half to eight pounds of pressure applied to the trigger to cause the gun to fire.
 {¶ 96} Viewing the evidence in the light most favorable to the state, a rational trier of fact could conclude that there was sufficient evidence to prove the essential elements of the crimes of murder and tampering with evidence beyond a reasonable doubt. Therefore, the trial court did not err by denying Appellant's Crim.R. 29 motion. Consequently, Appellant's sixth assignment of error is not well taken.
 III {¶ 97} Appellant's assignments of error are overruled. The judgment of the trial court is affirmed.
CARR, P.J., BATCHELDER, J. CONCUR.
[1] Evid.R. 402 provides in pertinent part: "Evidence which is not relevant is not admissible."
[2] We also note that the record indicates that Appellant was able to provide the jury with another reason as to why he possessed a firearm. During direct examination, defense counsel asked Appellant why he placed his girlfriend's gun under his pillow before he went to bed, and Appellant replied: "At times — well, first of all, I live in a rough neighborhood, filled with drug dealers, drug users, and I know — for the simple fact that I'm an easy target to anyone that sells drugs or uses drugs."